**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**PATRICIA JUNE CRAWFORD,**

             **Plaintiff,**

    **v.**                           **Civil Action 2:20-cv-00634**
                                    **Judge Edmund A. Sargus, Jr.**
                                    **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

             **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Patricia June Crawford, brings this action pro se pursuant to 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors (Doc. 12) and **AFFIRM** the Commissioner's decision.

## I.     BACKGROUND

### A.     Summary of Proceedings

Plaintiff filed her application for DIB in June 2012, alleging that she became disabled on August 8, 2010. (Tr. 175–78). After her application was denied initially and on reconsideration, the Administrative Law Judge ("ALJ") held a hearing, (Tr. 357–405), and issued a written determination denying benefits on September 5, 2014 (Tr. 13–28). Plaintiff sought judicial review of that determination in an action docketed in this Court as *Crawford v. Commissioner of Social Security*, 2:16–cv–799 (ALM–TPK). While that federal action was pending, Plaintiff filed a second application on February 9, 2017. (Tr. 436). On June 12, 2017, this Court remanded Plaintiff's case back to the state agency. (Tr. 419–431, 432, 433). The Appeals Council vacated

its prior determination, consolidated Plaintiff's applications, and ordered further proceedings. (*Id.*) A hearing was held before the ALJ (Tr. 313–56), who issued a second unfavorable determination on July 27, 2018 (Tr. 293–307).

Plaintiff initiated this action pro se on January 10, 2020. (Doc. 1–1.) It is now fully briefed and ripe for resolution.

**B.  Relevant Record Evidence**

1.  *Plaintiff's Hearing Testimony*

Plaintiff appeared pro se at the May 23, 2018, hearing. (Doc. 9, Tr. at 315). She testified that her medical records were incomplete. (Tr. at 319). Specifically, Plaintiff testified she had treated with new podiatrists at Gentle Foot Care. (Tr. at 319, 331, 353–54). She stated that she had four or five short visits with the new podiatrist but that she had been treated by a different podiatrist at the same office about three or four weeks prior to the hearing and that he had taken x-rays, ordered an MRI, and had spent two hours with her at that visit. (Tr. at 319–320). Plaintiff indicated that her file did not contain those records but that she could obtain them. (Tr. at 319). Plaintiff also testified that she had began treating with a new doctor for her mental health issues but that she was not comfortable with that provider and she could not remember the provider's name. (Tr. at 320–321). Plaintiff agreed that she would provide the provider's name after she went home so that the agency could obtain the records. (Tr. at 321). Plaintiff also presented the ALJ with two letters written by her mother and her aunt. (Tr. 322–23).

With regard to her mental health issues, Plaintiff testified that she thought that she had always been depressed although she had never been diagnosed with clinical depression. (Tr. at 332). Her mother died in 2014, and she did not know why she could not "get over it." (Tr. at 333). Her depression had also gotten worse as a result of her father's medical condition and death. (Tr.

at 333–34). She had sought treatment from a psychologist at Mid Ohio, but was uncomfortable with the counselor's young age. (Tr. at 334–35). She went to another provider but she could not recall that provider's name. (Tr. at 335). After she went through intake at that new provider, she was exited for failing to follow up, however, Plaintiff testified that the new provider had never called her. (*Id.*) Plaintiff stated that she was never on antidepressant medication. (*Id.*)

Prior to her parents' death, Plaintiff "did everything" for them. (Tr. 336–37). After they passed away, Plaintiff returned to work part-time in 2015 at A1 Nursing as a homemaker taking care of senior citizens. (Tr. at 337, 325–26). At that job, she would physically move, change, and feed a vegetative client who weighed 110 pounds, and she did house cleaning for other clients. (Tr. at 326). When she was not working at that part-time position, Plaintiff would sit on the sofa and cry. (Tr. at 338). At that time, she also developed a gambling addiction. (*Id.*) She used the proceeds from her mother's life insurance policy to play slot machines at Scioto Downs. (Tr. at 339). She would also sit at the casino and cry. (*Id.*) She would go to the casino four or five times a week. (*Id.*) Sometimes she would be there overnight. (*Id.*) She indicated that she currently goes to the casinos twice a week. (*Id.*) Plaintiff also told ALJ Hartranft that she needed help with her gambling and that she hoped the courts would help her get the mental health help that she needed even if her application was denied. (Tr. at 345.)

With regard to her physical impairments, Plaintiff stated that she fell in 2014, that she had fallen twice while working in the last four years, and that beginning in the October prior to the hearing, she had difficulties walking up and down steps and the pain in her right leg became excruciating. (Tr. at 330). The pain was also in her right ankle and leg. (Tr. at 331). Her foot pain would give her headaches. (Tr. at 332). That pain prompted her to take a 90 day leave from her job at A1 nursing. (Tr. at 330–31.) Plaintiff's hands and arms would also sometimes "drop."

(Tr. at 331).  Plaintiff stated that she had been diagnosed with plantar fasciitis in the 1980s and that it had worsened.  (Tr. at 341).  She previously worked as a waitress and in warehouses but could no longer handle even a one-hour shift.  (Tr. at 342).

2. *Relevant Medical Records*

The ALJ usefully summarized Plaintiff's medical records and symptoms related to her physical impairments that the ALJ deemed severe:

> The medical evidence of record shows that the claimant has degenerative disc disease of the lumbar spine . . . .  The claimant presented to one of her consultative examinations complaining of chronic back pain . . . .  Upon examination, the claimant has had no tenderness to palpitation of the lumbar spine and straight-leg raising tests have been normal . . . . X-rays of the lumbar spine in April 2017 showed evidence of multi-level lumbar intervertebral narrowing and lower lumbar robust facet arthropathy and grade 1 degenerative spondylolisthesis at the L4–L5 level . . . .  the claimant has not received any actual treatment for this condition . . . .
>
> The record indicates that the claimant has arthritis of the right knee . . . .  The claimant has presented to consultative examinations complaining of right knee pain . . . .  Upon examination the claimant has had some decreased range of motion, but with normal laxity and no crepitus . . . .  X-rays of the right knee in September 2012 showed evidence of some very mild narrowing of the joint space and cartilage interval medially . . . . The  claimant has not received any actual treatment for this condition . . . .
>
> The record demonstrates that the claimant has osteoarthritis of the right foot and ankle and plantar fasciitis of the right foot . . . .  The claimant has presented to the doctor complaining of right foot and ankle pain . . . .  The claimant's right foot and ankle examinations have varied, but have generally shown pain to palpitation of the heel, pain with range of motion of the foot and ankle, edema over the proximal mid/rear foot, and excessive pronation with hypermobility at the level of the midtarsal joint . . . .  A weight bearing and gait evaluation noted significant collapse of the medial longitudinal arches with corresponding lateral impingement at the sinus tarsus . . . .  X-rays of the bi-lateral feet in July 2017 showed evidence of inflammation of the Achilles tendon and plantar tendons on the right foot, degenerative changes in the joints of both feet, and calcaneal spurs on both feet . . . . However, x-rays of the right foot and ankle in February 2018 were described as normal . . . .  An ultrasound of the right heel in February 2018 demonstrated hypoechoic signal intensity with significant focal edema and thickening at the level of the plantar fascia origin . . . .  On the other hand, a repeat ultrasound of the right heel in April 2018 was unremarkable . . . .  Another set of x-rays of the right ankle performed in May 2018 revealed only minimal degenerative changes and even joint

4

spaces medially to laterally; subtalar joint with significant narrowing and sclerotic bone formation over the middle and anterior facets with moderate degenerative changes noted at the midtarsal joints; moderate degenerative changes throughout the mid tarsus; and mildly increased soft tissue density in the rear foot . . . . The claimant has been prescribed anti-inflammatories and a transcutaneous electrical nerve stimulator (TENS) unit for pain . . . . She has also had an Una Boot compressive medicated dressing and foot/ankle strapping applied, was provided an AFO fracture orthosis, and was advised to obtain orthotics and support shoe gear . . . . The claimant has reported improvement of her symptoms with treatment . . . .

The claimant is obese . . . . She is five feet, five inches tall and weighs 190 pounds . . . . That is a body max index of 31.6, which indicates obesity . . . .

(Tr. at 303–04).

### C.    Summary of the ALJ's Decision

The ALJ found that Plaintiff met insured status requirements through December 31, 2018, and that, although she had worked, she had not engaged in substantial gainful activity since August 8, 2010, the alleged onset date. (Tr. at 298). Next, he concluded that Plaintiff's mental health impairments of adjustment disorder with depressed mood, major depressive disorder, and gambling disorder were not severe. (Tr. at 300). In arriving at that conclusion, the ALJ gave great weight to the opinions from the agency psychological consultants, Tonnie Hoyle, PsyD. And Bruce Goldsmith, PhD., that Plaintiff's mental health impairments were not severe because the consultants were familiar with the program, they had a longitudinal view of the record evidence, and their opinions were consistent with the record evidence. (*Id*.) He further explained that Plaintiff has received little mental health treatment and that she has continued to work despite her symptoms and that this is consistent with non-severe impairments. (*Id*.) He also gave significant weight to the opinion from consultative examiner Margarte G. Smith, PhD. because Dr. Smith's opinion that Plaintiff had only mild mental limitations was consistent with the record evidence. (Tr. at 300–301). The opinion from consultative examiner James C. Tanley, PhD. was given partial weight because he did not provide affirmative limitations in some areas of mental functioning and

instead suggested areas where Plaintiff might have or there would be a possibility of limitations. (Tr. at 301.)

The ALJ concluded, however, that Plaintiff suffers from the following severe physical impairments: degenerative disc disease of the lumbar spine; osteoarthritis of the right knee; osteoarthritis of the right foot and ankle; plantar fasciitis of the right foot; and obesity. (Tr. At 299). But he found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. at 301).

As for Plaintiff's residual functional capacity ("RFC"), the ALJ concluded:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except the claimant can frequently climb ramps and stairs; can occasionally climb ladders, ropes, or scaffolds; and can frequently kneel, crouch, and crawl.

(Tr. at 302).

When assessing that RFC, the ALJ considered medical opinions about Plaintiff's physical impairments. He gave the opinions from the state agency medical consultant at the initial level, William Bolz, M.D., little weight because the record demonstrated that Plaintiff was less limited than Dr. Bolz opined. (Tr. at 303–304). On reconsideration, Rannie Amiri, M.D., the state agency consultant opined that Plaintiff was capable of medium work with several postural limitations (frequently climbing ropes and stairs, crouching, and crawling, and occasionally climbing ladders, ropes, and scaffolds) (Tr. at 110–111). The ALJ gave her opinion great weight, however, because Dr. Amiri was familiar with the program, she had a longitudinal view of the evidence, and her opinion was consistent with that evidence. (Tr. 304–05). He further explained that the record showed that Plaintiff had not received any treatment for some of her physical impairments, that she had received no more than conservative treatment for her other physical impairments, and that

she had worked a consistent amount since the alleged onset date despite her conditions which was consistent with the ability to perform a wide range of medium work.  (Tr. at 305).

The ALJ assigned partial weight to the opinion from consultative examiner, Herbert Grodner, M.D., because he did not provide a function-by-function assessment, his opinion was inconsistent with the record evidence, and his opinion was internally inconsistent.  (*Id.*)  Although Dr. Grodner opined that Plaintiff cannot stand or walk for more than one hour at a time, he also noted that Plaintiff had very minimal degenerative changes in her right knee and an unremarkable foot examination.  (*Id.*)  Plaintiff had also worked in medium strength positions after her alleged onset date.  (*Id.*)  He also assigned partial weight to the opinion from consultative examiner Judith Brown, M.D. because although her opinion supported a finding that Plaintiff could perform medium work, Dr. Brown did not provide a function-by-function assessment.  (*Id.*)

Finally, the ALJ relied on testimony from a vocational expert to find that Plaintiff was capable of performing past relevant work including home attendant, courier, sales attendant, and warehouse worker because those positions were not precluded by her RFC.  (Tr. at 305–07).  He therefore found that Plaintiff was not disabled as defined under the Social Security Act.  (Tr. at 307).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards."  *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x. 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.    ANALYSIS

Plaintiff's allegations of error are not entirely clear. She states:

> First, both my mental and physical conditions were misdiagnosed – as evidenced in the judge's denial of my claim – my claim was later granted but without viewing all the documentation. I also must note that I can not be properly diagnosed in three hours at three different times by three different psychologists. There is more evidence that must be viewed.

> Second, when the magistrate along with the vocational expert interrupted my testimony to leave for a water break, they did not allow me to finish my testimony on my gambling addiction . . .

(Doc. 12.) Defendant asserts that Plaintiff's statement of errors does not contain a legally cognizable argument and that to the extent it does, they are skeletal and underdeveloped, and should be considered waived. (Doc. 14.) The Undersigned generally agrees.

"'Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones.'" *Bawkey v. Comm'r of Soc. Sec.*, No. 1:17-CV-1068, 2019 WL 1052191, at *8 (W.D. Mich. Feb. 6, 2019), *report and*

*recommendation adopted*, No. 1:17-CV-1068, 2019 WL 1044448 (W.D. Mich. Mar. 5, 2019) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). Importantly, pro se litigants, like Plaintiff, are held to this same standard. *See Bawkey*, 2019 WL 1052191 (citing *Reid v. Quality Serv. Integrity*, No. 16-5107, 2016 WL 11258239, at *1 (6th Cir. Aug. 19, 2016) (internal citations omitted) ("Although pro se filings should be liberally construed, pro se litigants must attempt to develop arguments regarding issues raised in their appellate briefs in order to preserve those issues for appeal.")). Plaintiff has made no attempt to develop her arguments, and the Undersigned is not obligated to do so for her. *See, e.g.*, *Doolittle v. Comm'r of Soc. Sec.*, No. 18-4176, 2019 WL 6464019, at *2 (6th Cir. Sept. 4, 2019) (holding that pro se plaintiff waived "any possible challenge to the ALJ's ruling" where "[s]he ma[de] no specific arguments to support [her] assertions, [ ] and d[id] not refer to any part of the record or cite any authority on which she relie[d]"); *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 490–91 (6th Cir. 2006) ("This challenge warrants little discussion, as Hollon has made little effort to develop this argument in her brief on appeal, or to identify any specific aspects of the Commissioner's determination that lack support in the record. Under these circumstances, we decline to formulate arguments on Hollon's behalf, or to undertake an open-ended review of the entirety of the administrative record[.]"); *Bawkey*, 2019 WL 1052191, at *8 (holding that pro se plaintiff waived his arguments where his "claims of error [were] nothing more than a list of grievances unaccompanied by any effort at developed argumentation"); *Tarver v. Comm'r of Soc. Sec.*, No. 1:10 CV 2721, 2011 WL 3900579, at *1 (N.D. Ohio July 8, 2011), *report and recommendation adopted*, No. 1:10CV2721, 2011 WL 3911116 (N.D. Ohio Sept. 6, 2011) ("This Court does not conduct a *de novo* review in social security proceedings, and certainly cannot be expected to craft an argument on Plaintiff's behalf.").

Nevertheless, construing Plaintiff's allegations liberally, it appears that she might be alleging that the ALJ rendered his determination without evidence that should have been part of the record.  A claimant has the ultimate burden of producing sufficient evidence to show the existence of a disability.  20 C.F.R. §§ 404.1512(a), 416.912(a).  But "Social Security proceedings are inquisitorial rather than adversarial . . ." and "[i]t is the ALJ's duty to investigate facts and develop arguments both for and against granting benefits."  *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000) (citing *Richardson v. Perales,* 402 U.S. 389, 400–01 (1971)).  Indeed, an administrative law judge "has a special, heightened duty to develop the record" "when a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures." *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x. 456, 459 (6th Cir. 2008) (citing *Lashley v. Sec'y of Health & Human Servs.,* 708 F.2d 1048, 1051 (6th Cir. 1983)).  In order to satisfy this heightened duty, an ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."  *Lashley,* 708 F.2d at 1052 (internal quotations omitted).  There is no bright line rule for determining when an ALJ judge has failed to fully develop the record; "[t]he determination in each case must be made on a case by case basis."  *Id.*

Plaintiff proceeded at the hearing pro se thus suggesting that a heightened duty may have been triggered.  But Plaintiff does not identify, describe, or attach any purportedly missing evidence.  At the May 23, 2018, hearing, Plaintiff testified that records from her treatment with podiatrists at Gentle Foot Care were not in her file.  (Tr. 319–320).  The ALJ specifically indicated, however, that he would order those records.  (Tr. at 353–54).  And the record indeed contains updated medical notes from that provider.  (Tr. at 649–58).[1]  The ALJ satisfied his duty to develop

---

[1] At the hearing, medical records, including records from Gentle Foot Care, were received into evidence as Exhibits 1F through 13F.  (Tr. at 318–19).  The certified record contains additional records from Gentle Foot Care dated May 10, 2018, marked as Exhibit 14F.  (Tr. 657–58).

the record as a result. *Figard v. Comm'r of Soc. Sec.*, No. 1:09-cv-425, 2010 WL 3891211, at *7 (W.D. Mich. July 1, 2010) (quoting *Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996)) (holding that an ALJ satisfies his "'duty to develop the record by obtaining pertinent, available medical records which c[a]me to his attention during the course of the hearing'").

The same is true with respect to Plaintiff's records from an unidentified mental health care provider. Plaintiff testified that those records were not in her file. (Tr. at 320–21). The ALJ told Plaintiff to provide the name of that doctor or counselor and that the state agency would also obtain those documents. (Tr. at 321, 354). Plaintiff does not allege that she provided such information and that the agency thereafter failed to obtain the records. *Morgan v. Astrue*, No. 3:09-cv-262, 2010 WL 3723992 at * 8 (E.D. Tenn. June 30, 2010), *adopted*, 2010 WL 3723985 (E.D. Tenn. Sept. 15, 2010) (holding that, even under the heightened duty standard, the Sixth Circuit "did not intend to impose a duty on ALJs to serve as a pro se claimant's investigator, researcher, records custodian, or advocate *outside of the courtroom*" and that the ALJ's 'special, heightened duty' typically does *not* impose upon him an affirmative duty to obtain the records himself") (emphasis in original). Accordingly, to the extent a heightened duty to develop the record may have been triggered, the Court finds that the ALJ fulfilled that duty.

To the extent that Plaintiff is referring to other evidence, "[e]vidence which was not a part of the record on which the Commissioner's final decision was based may not be considered as part of the administrative record for purposes of judicial review." *Cocroft v. Colvin*, No. 2:13-CV-729, 2014 WL 2897006, at *2 (S.D. Ohio June 26, 2014) (citing *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Stevens v. Astrue*, 839 F. Supp. 2d 939, 951 (S.D. Ohio 2012)). Instead, "[j]udicial review is confined to the evidence that was available to the Commissioner." *Cocroft*, 2014 WL 2897006, at *2 (citing *Hollon ex rel. Hollon*, 447 F.3d at 487). "Evidence submitted in

the first instance to the district court may only be considered in determining whether remand is appropriate pursuant to sentence six of 42 U.S.C. § 405(g)." *Cocroft*, 2014 WL 2897006, at *2 (citing *Stevens*, 839 F. Supp. 2d at 951).

Plaintiff has not, however, requested a sentence six remand. *See Cocroft*, 2014 WL 2897006, at *2 (noting that plaintiff simply submitted new evidence without requesting a sentence six remand). Nor has Plaintiff established that such a remand would be warranted by showing that any other evidence is both new and material although the burden to so is hers. 42 U.S.C. § 405(g); *see also Cocroft*, 2014 WL 2897006, at *12 (citations omitted) ("The plaintiff has the burden of establishing that the evidence is new and material and that there is good cause for not having presented the evidence to the Administrative Law Judge."). Indeed, and as noted, Plaintiff has failed to identify, describe or attach the evidence to which she refers. The Undersigned cannot conclude that a remand is warranted due to any unidentified missing evidence.

Plaintiff also appears to complain that the record was underdeveloped because she was not allowed to testify fully about her gambling addiction at the May 23, 2018, hearing. (Doc. 12). A review of the hearing transcript belies that assertion. Plaintiff testified at length about her gambling addiction issues, and the ALJ asked her relevant questions about the same. (Tr. at 338–40, 345–46).

| [Plaintiff]: | . . . I – had started my gambling addiction at that time. I went through – |
|---|---|
| ALJ: | Okay. I appreciate you being open bout that. Can you tell me about your gambling addiction? |
| [Plaintiff]: | Well, after my mom died, I can say this much, first off, I'd like to say. You know, my folks used to go to Vegas or different places, Michigan or so forth, and I was always the one to say, oh, no way. I'm not going to spend my money. I worked too hard for it. Okay? So, there was against – and still is, but I do it. Okay? It's like it's against my religion, but I'm doing it. After my Mom died, I got |

|         |                                                                                                                                                                                                                                                                                                                           |
|---------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|         | $10,000 from, you know, the life insurance, and I'm embarrassed to say, I'd go to the casino and just sit there and cry and cry and cry. And give money.  I'd never win or anything but just sit there and cry and cry and cry.                                                                                             |
| ALJ:    | What games were you playing?                                                                                                                                                                                                                                                                                              |
| [Plaintiff]: | Oh, slot machines.  I would go to the Scioto Downs and just cry an cry and cry.                                                                                                                                                                                                                                     |
| ALJ:    | The slot machines?                                                                                                                                                                                                                                                                                                        |
| [Plaintiff]: | Yes.  They only have slot machines.  And I would just – I wasn't in any high/low room or anything, but I would just go and maybe –                                                                                                                                                                                   |
| ALJ:    | How often would you go?                                                                                                                                                                                                                                                                                                   |
| [Plaintiff]: | Oh, I was – I wasn't – at first I wasn't working.  I would go maybe – I'm going to say maybe four times a week, maybe five times a week.  I don't know.  But I would go there, and you know, it's like I wasn't doing anything else.  I'd go there.  I'd go there overnight, sit there and cry and feel embarrassed or try to talk to someone, you know, because – |
| ALJ:    | How much are you gambling right now?                                                                                                                                                                                                                                                                                      |
| [Plaintiff]: | I go still like twice a week, but I want – I do want to say this: I went through that $10,000 in less than three months.  Okay?  It may have come in October, November, December.  It was gone.  And I'm so embarrassed to say that, but that's the way it is, because I – I know better. And I believe when you know better, you're supposed to do better, and I'm not doing better. |

(Tr. at 338–40).

In addition, Plaintiff testified that she hoped that the courts would help her get proper mental help, would demand that she get help for her gambling issues, and would recommend a good, certified, real psychologist.  (Tr. at 345–46).  The ALJ correctly indicated that such assistance was outside the scope of what he could provide before taking a break.  (Tr. at 346).

|         |                                                                                                                                      |
|---------|--------------------------------------------------------------------------------------------------------------------------------------|
| [Plaintiff]: | I – I did leave a few things out.  I knew he was going to talk about the gambling, but – oh, can I speak?                       |

ALJ:      Yeah. I'm listening.

[Plaintiff]:    You know, I – I know my gambling. I need help Your honor. Whether this is granted or not, I need help, and I hope the Courts can help me get the proper mental help that I need. I'm working with this doctor. Like I said, I have an MRI scheduled. But you know, we've been through an eviction. We've been through a bankruptcy. When I met my husband, he took care of all his bills. He had good credit. Okay? He took care of his bills. He had all of his bills, he was good, and since we met, we've been through an eviction because of me and my gambling. He had to file bankruptcy maybe three or four years ago because of my gambling. And I have done a lot of lying to him. I could tell you for instance . . . .

ALJ:      No. I don't . . . .

[Plaintiff]:    Okay. Just for gambling, I said I needed this or that for something, and it was all for gambling. So, I know ther's a severe problem there that I hope I can – you know, the Court would demand that I get help.

ALJ:      Okay.

[Plaintiff]:    And as far as – you know, I didn't read everything, but you know I've been suffering in silence for many years, and I would hope that the Court could also recommend a good, you know, certified, a real psychologist or psychiatrist.

ALJ:      I'm afraid that's outside the scope of what I can do m'am. I'm not allowed to make any referrals or recommendations for any kind of treatment. My only – the only thing I can do is determine your case. All right. We've been talking for almost an hour here, and I need to get a quick drink. So we're going to get something to drink. We're going to come back, and then we're going to get the doctor's testimony.

(Tr. at 345–46). The Undersigned cannot conclude that this constitutes a failure to develop the record.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## V.    PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

**IT IS SO ORDERED.**


Date:   November 9, 2020                         /s/ Kimberly A. Jolson
                                                 KIMBERLY A. JOLSON
                                                 UNITED STATES MAGISTRATE JUDGE